**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

**DEINNA G.,**

     **Plaintiff,**

**v.**               6:18-CV-1342 (NAM)

**ANDREW M. SAUL, COMMISSIONER
OF SOCIAL SECURITY,**

     **Defendant.**

---

**Appearances:**

Deinna G.
*Plaintiff Pro Se*

Catharine L. Zurbrugg
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Counsel for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

**I. INTRODUCTION**

  Plaintiff Deinna G. filed this action under 42 U.S.C. § 405(g), challenging the denial of her applications for Social Security Disability ("SSD") insurance benefits and Supplemental Security Income ("SSI"). (Dkt. No. 1). Acting *pro se*, Plaintiff submitted a Form Complaint for appeal of a decision by the Commissioner of Social Security ("Commissioner"), requesting judicial review and entry of judgment for such relief as may be proper. (*Id.*). Despite several reminders, Plaintiff failed to submit a brief in support of her

appeal. (*See* Dkt. Nos. 6, 12). The Commissioner submitted its brief on June 11, 2019. (Dkt. No. 13). After carefully reviewing the administrative record, (Dkt. No. 10), the Court affirms the decision of the Commissioner, for the following reasons.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for SSD and SSI benefits on July 23, 2015, alleging that she became disabled on November 24, 2007. (R. 133, 135). The Social Security Administration ("SSA") denied Plaintiff's claims on November 10, 2015. (R. 77–82). Plaintiff appealed, and a hearing was held on July 13, 2017 before Administrative Law Judge ("ALJ") John Ramos. (R. 29–53, 83). On October 16, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 15–24). Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1–3). Plaintiff then commenced this action. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff alleged that she became unable to work on November 24, 2007 due to depression, anxiety, social phobia, mood disorder, prior drug addiction, and asthma. (R. 175). Plaintiff stopped working at her last job because the office "had budget cuts and [she] was let go." (*Id.*). Plaintiff was born in 1972. (R. 54). She received her GED in 1990, and has past work experience as a cashier, office worker, receptionist, and waitress. (R. 176).

At the administrative hearing, Plaintiff testified that she suffers from "social anxiety" and "phobias" that cause insomnia. (R. 37). She stated that she struggles "on a daily basis to do anything," and is "in therapy to try to figure out why [she has] changed so dramatically." (*Id.*). She stated that she attends therapy every couple of weeks, and takes medications for her anxiety and depression that "help some, but not completely." (R. 40). She complained of

insomnia, and described having phobias of bugs and being around other people. (R. 46–47). Plaintiff testified that she does not socialize much and has a strained relationship with her family "[b]ecause of her past drug addiction." (R. 47). She stated that she obsessively worries about her son's safety and her own health. (R. 48).

Plaintiff reported that she prepares simple meals on a daily basis and can perform household chores. (R. 188). She cares for her three-year-old son and is able to "take care of all his needs." (R. 187). She leaves the house to go grocery shopping and to pay bills. (R 189). She can manage money, drive a car, and leave the house alone. (*Id.*). She takes her son to the park at least once a week for an hour. (R. 48).

Plaintiff stated that she is limited in her ability to lift things and experiences pain when kneeling. (R. 191). She estimated that she is able to walk for 20 minutes without stopping. (R. 192). Plaintiff explained that she suffers from asthma and panic attacks which are triggered by her anxiety issues. (R. 193–95). She reported being able to finish what she starts and follow instructions. (R. 192–93). She stated that she is "distracted by worry of how [she is] going to support [her] son," and is "always thinking [she is] not worthy, or good enough." (R. 192). She reported that she "always felt inferior or [that she] was being judged negatively." (R. 193). She stated that "[s]tress causes her to quit before [she] even begin[s]" and "change[s] in schedule make [her] feel that [she] can't succeed." (*Id.*).

### C. Medical Evidence of Disability

#### 1. Central New York Services, Inc.

In September 2012, Plaintiff received a mental health assessment at Central New York Services, Inc., a private, not-for-profit behavioral health organization. (R. 220–53). Plaintiff reported that she had relapsed into drug use beginning in July 2012 when she took painkillers

3

following kidney stone surgery. (R. 220, 232). She stated that she attended AA once a week and was seeking employment. (R. 230–31).

The evaluator determined that Plaintiff's thought process was "unremarkable," she had "adequate" motivation and interest in the evaluation, she was "alert and responsive," her mood was "appropriate," she had no problems maintaining attention and was not distractible, and her memory, cognitive functioning, insight, and judgment were intact. (*See* R. 236–38). She successfully completed the treatment program in September 2013, including remaining abstinent from drugs and alcohol and complying with her treatment. (R. 249). The evaluator found that Plaintiff's prognosis was "very good." (R. 250).

### 2. Human Technologies Corporation

In January 2014, Plaintiff received a psychiatric evaluation and medication management review through the Mental Health Connections program at Human Technologies Corporation for her alleged mood swings, anger, depression, and anxiety. (R. 286–88). Plaintiff was seen by Nurse Practitioner ("NP") Robert Sharpe, who assessed that Plaintiff was alert and fully oriented, with clear speech, a linear thought process, and logical associations. (R. 288). NP Sharpe noted that Plaintiff exhibited an "overwhelmed and angry" mood and affect. (*Id.*). He noted that Plaintiff's appearance was neat and clean, her body posture was relaxed, and her memory, concentration, judgment, and insight were all intact. (*Id.*). NP Sharpe diagnosed "anxiety disorder," "depressive disorder," "obsessive-compulsive disorder," and "polysubstance abuse dependence, reported to be in remission." (*Id.*).

Overall, Plaintiff's mental status examination results from January to July 2014 remained essentially the same, with Plaintiff's mood generally improving over that period. (*See* R. 288–89, 292, 294, 296, 298). A follow-up examination later in January 2014 revealed

4

similar results, though Plaintiff's memory and concentration were "grossly intact," and she reported an improved mood. (R. 289–90). During an assessment in February 2014, Plaintiff reported that her mood was "better," and she was found to exhibit "good" judgment and "fair" insight. (R. 292). When Plaintiff returned to NP Sharpe in April 2014, she said that her mood was "up and down," but on May 13th, her mood was "pretty good overall," though she had some "ongoing stressors." (R. 294, 296). In July 2014, she told NP Sharpe that her mood was "good." (R. 298).

### 3. Mohsin Syed, M.D., Slocum-Dickson Medical Group

Plaintiff saw internist Dr. Mohsin Syed in December 2013 to establish care at Slocum-Dickson Medical Group. (R. 331). Dr. Syed noted Plaintiff's history of drug use, anxiety, and asthma. (*Id.*). She reported that she smoked six to seven cigarettes per day. (*Id.*). Dr. Syed assessed that Plaintiff's physical examination results were unremarkable and encouraged her to quit smoking. (R. 331–32).

In April 2014, Plaintiff presented to Dr. Syed for an annual physical examination and psychiatric assessment. (R. 324–27). Plaintiff's physical examination was generally unremarkable. (*Id.*). As to mental health, Dr. Syed found that Plaintiff exhibited no anxiety, agitation, or depression. (R. 326). He also assessed that Plaintiff's judgment and insight were "intact." (*Id.*).

Plaintiff returned to Dr. Syed in June 2014; her physical examination results were unremarkable, but she reported that her anxiety was not well controlled. (R. 322–23). Plaintiff returned on January 20, 2015 with complaints of congestion and shortness of breath. (R. 319). Her physical examination results were otherwise unremarkable. (R. 320). Dr. Syed again

5

counseled Plaintiff on smoking cessation and prescribed Advair to improve her breathing. (R. 319).

### 4. Jaqueline Santoro, Ph.D., Consultative Examiner

In October 2015, Plaintiff presented to Jacqueline Santoro, Ph.D. for a psychiatric evaluation. (R. 309–13). Plaintiff informed Dr. Santoro that she had been hospitalized for depression and drug problems in the past. (R. 309). Plaintiff reported that she was prescribed Celexa for depression, Suboxone for her addiction problems, Klonopin for anxiety, and Advair for asthma. (*Id.*). Dr. Santoro noted that Plaintiff endorsed symptoms of depression including social withdrawal, dysphoria, crying spells, irritability, loss of interest, diminished self-esteem, difficulty sleeping, fatigue, and concentration difficulties. (R. 309–10).

Dr. Santoro noted that Plaintiff's thought processes were "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia." (R. 311). She noted that her mood was "dysthymic," and found that her affect was "anxious" and "nervous." (*Id.*). Dr. Santoro reported that Plaintiff's memory skills, attention, and concentration were all "intact," and she was able to count and conduct simple calculations. (*Id.*). Dr. Santoro found that Plaintiff's insight and judgment were "fair" and that her cognitive functioning was "average to below average." (*Id.*). Dr. Santoro also noted that Plaintiff "is able to dress, bathe, and groom herself, cook and prepare food, do general cleaning, shop, manage money, and drive." (*Id.*). Plaintiff reported that she does not have friends, but is close with her mother. (R. 311–12). She stated that she spends her days caring for her son. (R. 312).

Dr. Santoro's medical source statement concluded that:

> The following are in the no limitation range: Follow and understand simple directions and instructions, perform simple

6

> tasks, and maintain attention and concentration. Moderate difficulties are noted in maintaining a regular schedule. No difficulties are noted in learning new tasks or performing complex tasks. Mild difficulties are noted in making appropriate decisions. Mild difficulties are noted in relating with others. Mild difficulties are noted in dealing with stress. Difficulties are due to psychiatric symptoms.

(*Id.*). Dr. Santoro found that Plaintiff's prognosis was "fair, given her history of drug use," and recommended that Plaintiff continue with "individual therapy and psychiatric intervention." (*Id.*).

### 5. Gerald Kleinerman, M.D., State Agency Consultant

In November 2015, psychiatrist Gerald Kleinerman, M.D., reviewed Plaintiff's medical records and assessed her mental status. (R. 68). Dr. Kleinerman found that Plaintiff's mental impairments were severe, but did not meet or equal a Listing. (*Id.*). Dr. Kleinerman noted that Plaintiff's medical history indicated problems with depression, anxiety, and drug abuse. (*Id.*). He opined that Plaintiff had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that she had one or two episodes of decompensation of extended duration. (*Id.*). He further opined that although Plaintiff had mild to moderate difficulty relating to others and dealing with stress, she retained the mental ability to perform simple jobs involving brief contact with others. (*Id.*).

### 6. Kristin Lints, LCSW-R, Upstate Cerebral Palsy

On October 6, 2016, Plaintiff had a mental health intake assessment with Licensed Clinical Social Worker ("LCSW") Kristin Lints at Upstate Cerebral Palsy. (R. 339). Plaintiff reported she had anxiety every day almost all day, and that she could not focus. (*Id.*). She reported difficulty with everyday things like going grocery shopping, and that she had a phobia of bugs in her home that had begun in the last few months. (*Id.*). Ms. Lints found that Plaintiff

7

was "engaging" and "pleasant," though her mood was depressed and she cried at times. (*Id.*). She was well-groomed, her speech was normal, her thought process was coherent and logical, and she had no suicidal ideation. (R. 340). Her cognitive functioning, concentration, attention, and judgment were all "fair." (*Id.*). She reported flashbacks and obsessive thoughts. (*Id.*).

Ms. Lints diagnosed generalized anxiety disorder, Post Traumatic Stress Disorder (with provision for further review), and general substance-related and addictive disorders. (R. 342). Plaintiff returned to Upstate Cerebral Palsy on October 16, 2016; her diagnoses remained the same and were to be addressed by abstinence, medication, and therapy. (R. 344–46).

### D. ALJ's Decision Denying Benefits

On October 16, 2017, the ALJ issued a decision denying Plaintiff's applications for disability benefits. (R. 15–24). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since November 24, 2007, the alleged onset date of her disability. (R. 18). The ALJ also determined that Plaintiff's date last insured was December 31, 2009. (*Id.*).

At step two, the ALJ found that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had two "severe" impairments: depressive disorder and panic disorder. (*Id.*).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) (the "Listings"). (R. 18–20).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels. Mentally, [she] retains the ability to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention

8

> concentration for simple tasks, and regularly attend to a routine
> and maintain a schedule. She can relate to and interact with others
> to the extent necessary to carry out simple tasks. [Plaintiff] can
> also handle reasonable levels of simple work-related stress, in that
> she can make decisions directly related to the performance of
> simple work and handle the usual work place changes and
> interactions associated with simple work.

(R. 21). The ALJ's underlying analysis explains that this assessment is supported by the objective medical evidence of record, by the opinions of Drs. Santoro and Kleinerman, as well as Plaintiff's reported activities of daily living. (*See* R. 21–22).

At step four, the ALJ determined that Plaintiff would be unable to perform any of her past work because the demands of those jobs would "exceed her [RFC]." (R. 22).

Finally, at step five, the ALJ determined that, based on Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she could perform. (R. 23). Thus, the ALJ concluded that at all relevant times, Plaintiff was not disabled under Sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act. (R. 23–24).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage

in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id.* at §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the

10

record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**C. Analysis**

Plaintiff is *pro se* and has not filed a brief in support of her appeal. The Complaint only alleges that "the [ALJ's] decision is not supported by substantial evidence," and requests that the Court "re-examine [her] case for disability." (Dkt. No. 1-1, p. 1). In deference to Plaintiff's *pro se* status and out of an abundance of caution, the Court has reviewed the administrative record, (Dkt. No. 10), and will assess whether the ALJ's decision is supported by substantial evidence. *See Hubbard v. Comm'r of Soc. Sec.*, No. 14-CV-1401, 2016 WL 551783, at *4, 2016 U.S. Dist. LEXIS 17300, at *9 (N.D.N.Y. Jan. 14, 2016) ("General Order 18 [ ] states that the Court will 'consider' the case notwithstanding a plaintiff's failure to file a

11

brief, albeit in a way that might be 'heavily influenced by the Commissioner's version of the facts.'").

### 1. Qualification for Listings

First, the Court will consider whether substantial evidence supports the ALJ's finding that Plaintiff did not have an impairment or combination of impairments that met the criteria for a Listing. (R. 18–20). The Listings "describe[ ] for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). In order to qualified for a Listing, a claimant must show that her impairment "meet[s] *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). Thus, "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* "Plaintiff has the burden of proof at step three to show that her impairments meet or medically equal a Listing." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009).

Here, the ALJ found that Plaintiff's impairments did not meet the criteria for Listing sections 12.04 (depressive, bipolar and related disorders), or 12.06 (anxiety and obsessive compulsive disorders). (R. 18–20). The ALJ found that Plaintiff only had: "mild difficulties in understanding, remembering, or applying information; mild difficulties in interacting with others; mild difficulties in concentrating, persisting, or maintaining pace; and moderate difficulties in adapting or managing oneself." (R. 18–19). In reaching these conclusions, the ALJ considered Plaintiff's subjective complaints, her activities of daily living, and the medical opinions from Drs. Santoro and Kleinerman. (R. 19–20). Specifically, the ALJ noted that Plaintiff lives independently, cares for her young son, manages her own money, and can cook,

12

drive, and shop without assistance. (*Id.*). The ALJ also refers to Dr. Santoro's assessment that Plaintiff had no limitations for following and understanding simple direction and instructions, performing simple and complex tasks, maintaining attention and concentration, and learning new tasks, and only mild limitations to making appropriate decisions, relating with others, and dealing with stress. (R. 20). The ALJ also referred to Dr. Kleinerman's assessment that Plaintiff had mild limitations to social functioning and concentration, as well as mild restrictions to her daily activities. (*Id.*).

Based on that evidence, the ALJ concluded that Plaintiff had none of the "extreme" or "marked" limitations that are required under paragraphs A and B for Listings 12.04 and 12.06. (R. 20). As for the paragraph C criteria, the ALJ assessed that "the record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (*Id.*).

The Court finds that the ALJ's analysis is supported by substantial evidence in the record, namely the assessments of Drs. Santoro and Kleinerman, as well as Plaintiff's activities of daily living. Notably, the record contains no evidence that Plaintiff's mental impairments caused any "extreme" or "marked" limitations, or that she only maintained a minimal capacity to adapt to changes in her environment.

Accordingly, the Court finds that there was substantial evidence to support the ALJ's conclusion that Plaintiff did not meet or equal the impairment criteria for Listings 12.04 and 12.06.[1] *See Vargas v. Comm'r of Soc. Sec.*, No. 16-CV-0484, 2017 WL 2838165, at *9, 2017

---

[1] The ALJ's analysis as to Plaintiff's failure to qualify for a Listing is also supported by his analysis regarding the RFC determination, which is supported by substantial evidence, as discussed below. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (noting that "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as

U.S. Dist. LEXIS 102235, at *8–14 (N.D.N.Y. June 29, 2017) (finding that the ALJ properly assessed the claimant's eligibility for the Listings 12.04 an d12.06 where the evidence showed he had no restrictions in activities of daily living, and only moderate difficulties in social functioning, maintaining concentration, persistence, and pace).

### 2. Residual Functional Capacity Determination

Next, the Court will assess whether substantial evidence supports the ALJ's determination of Plaintiff's RFC. To determine an RFC, the ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). An RFC "will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations." *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990). According to the Regulations, the RFC must "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96-8P. Among those functions are mental abilities:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(c).

---

[the court] is 'able to look to other portions of the ALJ's decision and to clearly [identify] credible evidence in finding that his determination was supported by substantial evidence'").

14

When developing an RFC, "an ALJ is entitled to rely upon the opinions of both examining and nonexamining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010). And, evidence of certain moderate limitations does not prohibit a claimant from performing unskilled work. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *see also Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (holding that moderate limitations in "relating to instructions, concentration, [and] attendance" are consistent with unskilled work).

Here, the ALJ's assessment of Plaintiff's ability to perform work at all exertional levels is supported by substantial evidence. Specifically, the ALJ assigned great weight to Drs. Santoro and Kleinerman, who both found that Plaintiff had only "mild" difficulties with regard to social functioning, decision making, and her ability to concentrate and handle work-related stress. (R. 19–20). The ALJ stated that these opinions were entitled to "significant weight because they are consistent with one another," "supported by [Plaintiff's] largely normal mental status exams," and were "also consistent with claimant's [daily] activities, and were not refuted by any treating sources." (R. 22). The ALJ further explained that "[Plaintiff's] most recent treatment notes of record document coherent and logical thought processes and 'fair' intellectual functioning, concentration, attention, insight, and judgment." (*Id.*). The ALJ noted that "[Plaintiff's] thought processes were coherent and goal directed," and "[h]er attention, concentration and memory skills were intact and her insight and judgment were 'fair.'" (*Id.*). The ALJ also cited evidence showing that Plaintiff's asthma "has been successfully controlled with medication, despite [her] smoking,"

15

and that her alleged physical limitations for lifting, kneeling, and using her hands were not supported by any medical evidence or her activities of daily living. (R. 21–22).

The opinions of Drs. Santoro and Kleinerman are also largely consistent with the assessments of several of Plaintiff's treating providers. For example, Plaintiff's assessment at Central New York Services indicated that her thought process was "unremarkable," she had "adequate" motivation and interest in the evaluation, she was "alert and responsive," her mood was "appropriate," she had no problems maintaining attention and was not distractible, and her memory, cognitive functioning, insight, and judgment were all "intact." (R. 236–38). The evaluator found that Plaintiff's prognosis was "very good." (R. 250). Similarly, treatment notes from NP Sharpe indicate that Plaintiff was fully oriented, had linear thought processes, and made logical associations. (R. 288). Plaintiff's mental status examinations in January and February of 2014 showed that Plaintiff's memory and concentration were noted to be "grossly intact," she reported that her mood was "better," and she exhibited "good" judgment and "fair" insight. (R. 289–90, 292).

In sum, upon careful review of the record, the Court finds that the ALJ did not err in assigning great weight to the opinions of Drs. Santoro and Kleinerman because their assessments are consistent with each other and the overall medical record. Thus, the RFC was supported by substantial evidence. *See Sloan v. Colvin*, 24 F. Supp. 3d 315, 324–26 (W.D.N.Y. 2014) (noting that a "consultative physician's opinion may serve as substantial evidence," and finding no error in ALJ's reliance on consultative examiner's opinion in developing the RFC); *see also Malcolm M. v. Comm'r of Soc. Sec.*, No. 17-CV-986, 2019 WL 187725, at *6–7, 2019 U.S. Dist. LEXIS 6330, at *17–21 (N.D.N.Y. Jan. 14, 2019)

(affirming the mental RFC where the ALJ relied on the opinions of consultative examiners and the plaintiff's activities of daily living).

### 3. Step Five Vocational Determination

Finally, the Court must assess whether the ALJ demonstrated that there was work in the national economy that Plaintiff can perform. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." SSR 82-53 (internal quotation marks removed). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.*

In this case, the ALJ determined that Plaintiff's impairments did not significantly limit her ability to perform the full range of unskilled work at all exertional levels. (R. 21). The ALJ also found that Plaintiff "retains all the basic mental abilities required to perform unskilled work on a sustained basis." (*Id.*). As discussed above, the ALJ's RFC assessment for Plaintiff is supported by substantial evidence in the record.

The ALJ's step five analysis considered Plaintiff's non-exertional limitations from the RFC, and appropriately determined that they had little to no effect on the occupational base of unskilled work available to Plaintiff. Accordingly, the Court finds no error in the ALJ's step five analysis or in the ultimate determination that Plaintiff was not disabled. *John W. v. Comm'r of Soc. Sec.*, No. 18-CV-177, 2019 WL 428785, at *7, 2019 U.S. Dist. LEXIS 17231, at *22 (N.D.N.Y. Feb. 4, 2019) (affirming the ALJ's step five assessment where he properly applied the Grids after finding that Plaintiff's limitations "had little to no effect on the occupational base of unskilled work").

17

## IV. CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

Therefore, for the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accord with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date: February 10, 2020
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge